Filed 6/21/23  Sonya J. v. Robert M. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SONYA J.,<br><br>        Petitioner and Appellant,<br><br>v.<br><br>ROBERT M.,<br><br>        Respondent. | A164423<br><br>(San Mateo County<br>Case No. FAM0127563) |

In 2015, the trial court issued a domestic violence restraining order ("DVRO") against appellant Sonya J. barring her from harassing her then husband Robert M. and their then minor children, S. and J.  In 2017, the DVRO was modified to require Sonya to take down her Facebook page and forbid her from posting about Robert or the children on social media or online for the duration of the DVRO.

Before the amended DVRO expired, Robert, now divorced from Sonya, petitioned to renew the DVRO and make it permanent.  In November 2021, following a four-day trial in which Robert and the now adult children testified in support of the petition, the court renewed the DVRO.  The renewed DVRO included a modified and narrower social media restriction which permitted Sonya's use of social media but restricted the substance of her posts.

We conclude the trial court did not err in renewing the DVRO.  We do not address Sonya's argument that a provision in the renewed DVRO

1

imposing social media restrictions on her is an unconstitutional prior restraint because, as a threshold matter, we find the provision unconstitutionally vague and remand for that reason.

FACTUAL AND PROCEDURAL BACKGROUND

## General Information

Sonya J. and Robert M. married in 1994.  They have two children: S., a daughter born in 1999, and J., a son born in 2002.  They separated in November 2014, and Sonya petitioned for dissolution of their marriage shortly thereafter.  Judgment in the divorce was entered in June 2018.

## The DVRO

On December 12, 2014, Robert filed a DVRO request to protect himself and S. and J., then ages 15 and 12, respectively, from Sonya.  The court issued a temporary restraining order pending a court hearing on the request.

On September 10, 2015, following the hearing, the court issued the DVRO with an end date of August 27, 2019.  Among other things, the court ordered Sonya to do the following: stop harassing Robert and the children; stay away from their work and schools; and move out of the family home.  No visitation was allowed pending mediation.

Approximately two years later, on October 16, 2017, and upon Robert's request, the court issued a temporary emergency ex parte order amending the DVRO.  The temporary order incorporated the following language into the DVRO: "Petitioner shall immediately take down her Facebook page and refrain from posting material about [Robert and the children] on any internet forum or website for the duration of the protective order."  Sonya opposed the modification.  On June 1, 2018, the court issued an amended DVRO incorporating the provision requiring Sonya to take down her Facebook page and to refrain from posting any material about Robert and the children on

2

any internet forum or website for the duration of the protective order.[1]  The expiration date of the amended DVRO remained August 27, 2019.

### *Criminal Protective Orders and Other Criminal Proceedings*

Throughout the four-year period the DVRO was in effect, various San Mateo County courts issued multiple criminal protective orders ("CPOs") to protect Robert and the children from Sonya, and several criminal matters arising from Sonya's conduct towards Robert proceeded against her:

*Case No. SM395386A*: On November 13, 2014, Sonya was charged with misdemeanor violations of Penal Code section 273.5, subdivision (a)[2] for inflicting corporal punishment on a spouse/co-habitant and section 243, subdivision (e)(1) for battery against a cohabitant.  On December 16, 2014, the court issued a one-year domestic violence criminal protective order protecting Robert from Sonya.  Later, the complaint was amended to add two misdemeanor contempt charges under section 166, subdivision (c)(1) for violating a protective order in a domestic violence proceeding.  On March 20, 2015, Sonya entered into a negotiated disposition in which she pled no contest to the two contempt charges, and the inflicting corporal punishment and battery charges were dismissed.  Sonya was sentenced to a year of probation, no contact orders, and 32 hours of anger management.  In addition, the court issued another domestic violence CPO with a three-year term protecting Robert, as well as S. and J., from Sonya.  The CPO allowed the children to initiate peaceful contact with their mother, but Sonya was barred from initiating such contact.

---

[1]     Notwithstanding her opposition to the amendment, it appears that Sonya eventually agreed to abide by the amendment as part of the settlement provisions included in the judgment of dissolution.

[2]     All further statutory references are to the Penal Code unless otherwise stated.

3

*Case No: 16-SM-001682*:  On February 19, 2016, Sonya was charged with another misdemeanor violation of section 166, subdivision (c)(1) for being in contempt of court for violating the CPO.  On April 6, 2016, the court issued another one-year CPO protecting Robert from Sonya.

*Case No: 16-SM-003626:* On April 5, 2016, in a new criminal proceeding, Sonya was charged with a misdemeanor violation of section 530.5 for unlawfully obtaining Robert's personal identifying information and using it for an unlawful purpose.  She was also charged with a misdemeanor violation of section 487, subdivision (a) for unlawfully taking $8,000 from Robert.

*Case No. 16-SM-013908:* On November 30, 2016, Sonya was charged with another misdemeanor violation of section 166, subdivision (c)(1) for being in contempt of court for violating the CPO.

*Case No. 17-SM-010509*: On August 23, 2017, Sonya was charged with two additional misdemeanor violations of section 166, subdivision (c)(1) for being in contempt of court for violating the CPO.

On November 27, 2017, the above four matters were resolved in another negotiated disposition in which Sonya pled guilty to one contempt charge (from Case No. 16-SM-13908) and the remaining charges were dismissed.  She was sentenced to 15 days in jail and three years of probation. The court entered another three-year domestic violence CPO against her.

### ***Request to Renew DVRO***

On June 5, 2019, Robert filed a request to renew and make permanent the DVRO.  Included in the request was a document listing a dozen alleged violations of the DVRO and crimes committed by Sonya between December 2014 and March 2019.  He also included a six-page statement entitled "Reasons to Fear Future Abuse."  Sonya opposed the request to renew the

4

DVRO on the basis that there was no objectively reasonable fear of future abuse. The matter was originally scheduled to be heard in late June 2019 but delayed for nearly two and a half years for numerous reasons, including the pandemic. The renewal hearing ultimately took place in November 2021 over the course of a four-day bench trial.

## Robert's Case

### Judicial Notice

The court took judicial notice of the DVRO and related orders, the CPOs, and the court dockets for the above-described criminal proceedings.

### Robert's Testimony

Robert testified that he, S., and J. had been granted a DVRO and four CPOs since 2014 but he did not consider himself protected over that period. Still, he wanted the DVRO renewed to protect the children because Sonya was a "vengeful person and has not respected the restraining orders at all, and it's hurt both kids badly and continues to do so." He counted approximately a dozen violations of no contact orders by his ex-wife. For example, she used third parties to give messages to S. and J., posted on Facebook to reach out to them and their friends, and spread rumors. In addition, Sonya stole his identity as well as $8,000. Around Christmas 2014, when their break-up was starting, she went to the house and stole all the presents from under the tree. In 2015, she pled no contest to contempt charges for violating the protective orders which resulted in "grand theft, identity theft" and "willful cruelty to a child" charges being dropped. In 2017, there was another plea bargain in which she pled no contest to two charges of violating the protective orders.

Robert "[a]bsolutely" feared for himself if the restraining orders were not renewed. On Facebook, she accused him of being physically violent to

5

her, lying to the police and judges, and having a secret bank account in the Cayman Islands. She physically abused him, too. In August 2007, for example, Sonya became upset with him and started swinging around a pewter trophy which struck him in the legs and caused cuts. In December 2013, during an argument in the kitchen, she got angry and punched him between the legs and "grabbed [him] by the testicles and kept yanking [him] around the island in the kitchen," which caused extreme discomfort. In November 2014, during an argument, she slapped him and kicked him in the groin several times. This was the incident that led him to call the police and resulted in her arrest. He noted that at the trial for the initial DVRO, Sonya admitted to hitting him, grabbing his testicles, and dragging him around the kitchen. He never fought back because he was "huge" and could hurt her.

It was commonplace for Sonya to scream at him. She had episodic "rages" in which she "would just scream and yell almost constantly," which impacted the children. When the children were little and came screaming into a room, she often reacted without thinking and hit them. Over the years, he saw her hit J. at least 10 times and she had also struck S., which she denied at her first trial. When the children became teenagers and started to push away, she became more violent with them. Several times, Sonya said she would stop yelling and hitting the children, but these periods were short. All the screaming, along with the episodes of violence, constituted emotional abuse.

To the best of Robert's knowledge, Sonya never underwent the psychological assessment ordered by the court. No such assessment was ever provided to his attorneys or the court.

Robert estimated that since restraining orders were issued in 2014, Sonya had violated them roughly 20 times, which caused his "[s]tress level [to

6

go] sky-high." There was no peace and no sense of security at home. Her violations interfered with his sleep, and his ensuing interactions with police when reporting the violations were generally unpleasant since officers were initially hostile to him. The violations interrupted his work and cost him jobs. He could not plan his social or professional life. Further, sometimes people approached him and asked him "crazy things" or became angry at him for something Sonya wrote. When the violations involved S. and J., he tried to protect them. But after a certain number of violations, they reached the point where they did not want to go spend three to four hours with the police.

Sonya's violations of the restraining orders also affected the children. The two lost friendships and received messages from friends accusing them of mistreating their mother. Others were uncomfortable socializing with them because of stories written by Sonya on Facebook. On Facebook, Sonya inaccurately posted that S. and J. beat her, perjured themselves, and lied to police and Family Court Services. She posted about their sexuality, their son's first erection, and the like. Other kids heard about the posts and humorously confronted S. and J. about them, but they did not find the comments funny.

Several judges in open court had warned Sonya not to publish anything online about the children. Sonya was also ordered to take down her Facebook page which included all posts relating to him and the children. She had agreed to this as part of their dissolution judgment. To Robert's knowledge, Sonya never took down her Facebook page after being served with the order instructing her to do so in violation of that order. He referred to 26 items she posted in the days following the takedown order, in which she referred to him as a toad and commented on their sex life. In her posts, she accused him of battering her, parental alienation, child abuse, and violence. In October

2017, she took her Facebook page down for several hours or a day. However, based on posts from July 2020, he understood that her Facebook page was "absolutely active." A November 2020 post included a picture of her and the children. Her posts were humiliating to him because he knew 700 people, including family and his friends and the children's friends, could read them. In social situations with people who are Sonya's Facebook friends, he constantly wondered what they had read about him and how they viewed him.

If there were no restraining order, Robert surmised that Sonya's posts would "go to the world" rather than just her private viewers, and she would write anything about him and the children. This would scar his reputation and continue to impact his social and professional life. He was also fearful of continued harassment without a restraining order. He believed the harassment, which had never stopped, would intensify. He feared Sonya would appear at their home or wherever he was and disturb his peace or destroy property.

On cross-examination, Robert stated that the last time he saw Sonya was in 2016 or 2017. He confirmed that he had no allegation of physical abuse by her since 2015. Even though he had a black belt in taekwondo, lifted weights, and was 280 pounds, he still considered her a physical threat. He acknowledged their arguments in which he raised his voice and an incident in which he punched a hole in the wall once in the mid-1990s for a matter unrelated to Sonya. He denied ever shoving Sonya in a bathroom incident which resulted in her hitting her head on the bathtub, as well as other incidents.

Robert also acknowledged monitoring Sonya's social media accounts, which included her Match.com account and public Facebook account, to know

what she was publishing about him and the children. He often took screen shots of her posts and printed them out. Her Match.com account profile included pictures of her and the children when they were young. He had 500 to 600 pages of posts but did not know when a particular post went down, or when the last time he saw a given post was.

### S.'s Testimony

S., age 22 at the time of trial, testified via Zoom. She feared Sonya and was uncomfortable testifying in her presence since she had not previously confronted her mother about her feelings. Based on experience, S. was also concerned that her mother might misconstrue her testimony as an invitation to contact her. S. wanted to make the restraining order permanent so that she could move forward without having to continuously renew the DVRO and deal with all the effort renewing entailed. The renewal process interfered with S.'s healing and recovery, as it brought up many negative emotions, fear, depression, and anxiety. She wanted a permanent order so that she no longer had to interact with her mother again and to avoid being dragged back to a bad place.

Without the restraining order, S. worried her mother would find her and she would not feel safe. S. declined to state where she was attending college because she did not want Sonya to come after her or contact the school. She was concerned for her own physical safety because she knew her mother was capable of extreme violence and emotionally unstable. If her mother were to find her and become upset, S. could readily imagine her getting violent and hurting her.

S. discussed various incidents of physical violence from the past. She had been slapped and pushed by Sonya. When she was young, her mother pushed her down the stairs. Sometimes when Sonya became upset with her

in the car, she tried to push S. out of the car while driving. S. did not believe her mother was ever concerned about her getting seriously injured during these incidents. Another incident which led to the initial DVRO occurred in December 2014, when Sonya was recording an argument they were having on her laptop. Sonya momentarily turned off the recording, elbowed S. in the face, and immediately resumed recording. When the police arrived, Sonya denied hitting S.

Sonya called the police all the time when she was upset and used the police to make S. and her brother afraid. In one incident, Sonya called the police, and told officers S. was making her feel unsafe. Her mother left the house, and S., then 14 years old, was left to talk to the responding officers.

Sonya also sometimes took away her and her brother's devices when their father went on business trips, as she did not want them to report her being violent or fighting. Sonya also did not tell them when he called either. Sonya yelled at her all the time. S. also witnessed her mother hit her father many times.

Because of her mother's abuse, S. developed PTSD and frequently had nightmares. S. suffered from eating disorders, which she attributed to her mother telling her she needed to lose weight. On occasion, Sonya prepared separate meals for S. because as a woman, S. burned fewer calories than her father and brother during the day. S. has been in therapy since she was 16 years old. When they were living together, S. was severely depressed and suicidal, but things have gotten better since her mother moved out.

There were many instances her mother violated the DVRO. On one occasion, Sonya came to one of S.'s theater performances wearing a wig and sunglasses. Another time when S. was still in high school, Sonya sent letters to all her teachers pushing for S. to attend a certain college. The idea that

10

her mother somehow found all her teachers and knew all her classes scared her.

S. maintained her belief that Sonya was emotionally unstable and unable to control her emotions. Her mother lashed out when upset and was incapable of abiding by the DVRO. Asked if she would be fearful of abuse by mother if the DVRO was not renewed, S. responded: "Yes, I am. She still -- you know, she hasn't ever taken accountability for abusing me. You know, I think she still thinks that this is unjust and that, you know, she deserves to have a relationship with me. And so if she still believes that, I don't think she's capable of changing." S. later added that this view was shaped by Sonya's Facebook posts in which she discussed everything being her father's fault, and never took personal responsibility for her own actions. She remained concerned that her mother would harass and stalk her and disturb her emotional peace. Having the restraining order permanently in place would make her feel a lot safer.

Finally, S. rejected the notion that her father convinced her to seek the renewal. As an adult who had been living on her own for a while, she could make the decision on her own and had done so.

On cross-examination, S. acknowledged that the last time her mother was physically violent with her was the elbowing incident in 2014 and that she alleged no violence since that date. The incident S. described of Sonya pushing her down the stairs was in 2010 or 2011. Her mother sent letters to her high school teachers in December 2017. The last time they engaged in a conversation was in 2016 over Facebook. The last time they interacted was in April 2020, when her mother drove by her as she was walking with a friend. Sonya only called out S.'s name and then kept driving. After that encounter, S. did not see her mother again that day.

### J.'s Testimony

J., age 19 at trial, also testified via Zoom and stated that he too wanted the DVRO renewed and believed it was a good security measure, especially for his sister. He recounted episodes of domestic violence he experienced as a child. It was primarily emotional abuse, which also manifested itself as physical abuse on many occasions. The family home was a "a hostile environment, with a lot of yelling and grabbing and things like that." Sonya yelled at him. She dragged him down the stairs, pushed him out of a moving vehicle, and withheld food from him if she were upset. Sonya locked him outside of the house for punishment. Once during an argument they had while in the car, she parked and left, and J. ran three miles home. She called him lazy and slow. J. did not feel safe with her.

There were times when Sonya violated the current DVRO. Once, he was at his friend's house, and Sonya appeared in the window. J., who recorded this incident, did not let her in the house and returned home with his friend. More recently, Sonya showed up at the house of another friend of his, creating a very awkward situation for his friend. Sonya's violations of the DVRO made him feel uncomfortable. With certain friends he trusted, he could be open about his family situation, but for others he did not know well who knew about his family problems, it was difficult.

If there were no restraining order, J. believed his mother would have no repercussions for her continued harassment. As in 2015 when the DVRO was first issued, he continued to feel Sonya was dangerous and disliked her for being terrible to the family or such a long time. He still had no desire to talk to his mother. The thought of seeing her in public or of her being aware of his whereabouts caused him anxiety. J. did not trust his mother to act rationally or be level minded. To him, his mother lashed out in ways destructive to

others quite often. While he would be fine if his sister wanted a relationship with their mother, he did not want one.

On cross-examination, J. stated that the last time his mother hit him was probably before December 2014. The incident in which he was dragged down the stairs took place in middle school. The incident where Sonya appeared in the window of his friend's house also happened when he was in middle school. The incident in which Sonya tried to push him out of a car took place when he was 5 years old. He last spoke to his mother before the DVRO was issued, around December 2014. He was 12 or 13 years old when he last saw her.

### Sonya's Testimony

Robert's counsel called Sonya to testify as an adverse witness. She denied ever having been convicted of criminal contempt for violating restraining orders though she acknowledged having pled no contest to four charges on the advice of her lawyers. She had wanted to go to trial on the charges, but her lawyer was not prepared and had not worked up a brief. She felt forced to enter a no contest plea. She did not remember the court's 15-day jail sentence and noted she did community service. She denied ever hitting S. in the face in December 2014. She did not remember ever hitting J. Nor did she have any memory of anything that happened in the trial leading up to the initial DVRO.

Sonya did not remember agreeing to take down her Facebook page and stop posting about the children as part of an overall settlement. She acknowledged posting on Facebook since December 2017 a piece on the pandemic and another one on a concert she attended when she thought the order was expired.

13

Sonya also did not recall any court order requiring her to undergo a psychological assessment. However, she acknowledged that her lawyer arranged for the assessment to be done with a doctor in Hawaii. She assumed her attorney provided Family Court Services with whatever report was required.

### Sonya J.'s Case

### Sonya's Testimony

At the time of her testimony, Sonya had been restricted from contact with S. and J. for nearly 7 years. This was a difficult period for her, as she worried about their wellbeing and believed it was important for adult children to have contact with both parents. She always loved S. and J. and believed no one could ever love them more than she loved them. She wanted them to know that she cared for them and that her door was always open to them.

Sonya hoped to mend her relationship with S. and J. If the restraining order were lifted, she would want to contact them but would defer to them to reach out to her if and when ready. Facebook provided a space where they could message her at any time. If they made such contact, she would follow their lead. She would offer to engage in reunification therapy with a psychologist if they wanted that, or just have a coffee if that is all they wanted. She understood S. and J. were now adults able to make their own decisions about whether to contact her. She recognized the process to mend their relationships would be long and not easy.

During her 20-year marriage with Robert, he threatened her hundreds of times. He told her she would lose him, the house, the children, and her life. He said she would never see the children again. He told her he would kill or destroy her, but she never took these statements seriously and

14

believed he was just angry. She described one incident in which Robert threw her into a bathtub, causing her to hit her head on the granite and injuring her.

Sonya avoided people who know Robert. She no longer attended her neighborhood book club because two members sided with Robert. She no longer attended services at the Mormon church because she had been recorded there twice and felt one person there believed irrational things about her. These spaces made her feel uncomfortable, and she did not want any of her actions misconstrued or to be used against her in the future.

On Facebook, Sonya expressed her thoughts on a wide variety of topics: religion, literature, the environment, politics. She had been very active on Facebook, especially to keep in touch with friends who, like her, were educated abroad and scattered all over the world. Her posts included messages with many international friends, including some who have since passed away.

Asked if she removed the posts that she was ordered to remove from Facebook, she replied, "Yes, I did." She figured that if the court order directed her to remove her posts by November 8, 2017, she did it before that date. She explained that she went to Facebook headquarters and asked for help to take the posts down in a way that she did not lose them forever. When Facebook staff asked if she wanted to have her posts archived, she agreed. She assumed the archive exists and believed she had access to it but would need technical help from Facebook, as she had not made any effort to retrieve the posts in the last 5 years. She had no plans to make the posts she removed publicly available, but it was important for her to keep the archive because it included messages with friends.

Sonya started therapy at the end of her marriage. Since then, she had been in therapy weekly. She took medication for anxiety. In the past, she participated in numerous psychological evaluations. Whenever her attorneys wanted her to see someone, she did so.

On cross-examination, Sonya acknowledged posting to Facebook regarding the pandemic (within the last three years). When asked whether it was correct that the court order required her to take down her Facebook page immediately and to not post on social media about Robert and the children, she stated she did not know that. Counsel attempted to impeach Sonya with a Facebook post in which she wrote: "[I]n court on Monday the ex moved to muzzle me on Facebook. He had my piece on "mercy fucks" that I had posted THE DAY BEFORE all ready to show the judge. The ex isn't my friend on Facebook and neither are our children. . . ." She agreed that she posted a statement stating that Robert wanted to shut her down on Facebook and that she had been ordered to take down her account and needed help to do so. Sonya understood the order to mean that she was to take down her posts by a certain date or be in contempt of court. She had no idea whether her psychological evaluations were ever provided to the court or opposing counsel, repeating that she followed her attorneys' instructions and that her attorneys should have provided them if required.

**Michael A.**

Michael A., who befriended Sonya in a divorce support group, testified in her support. In 2016, Sonya asked him to accompany her to a play in which S. was performing, and he agreed. At the theater, they sat as far back as possible. Sonya never approached S., nor did she try to get her daughter's attention. At the conclusion of the performance, when the actors dispersed into the audience to collect donations, S. approached her mother and gave her

16

a big hug.  After they embraced for a minute, S. told Sonya she loved her, and she had to go.  Sonya did not try to stop S. or say anything further to her.

***Expert Witnesses Testimony***

Dr. Harlan Watkins, a physician qualified by the court as an expert on PTSD and anxiety disorder, testified about the forensic medical evaluation he conducted on Sonya.  He opined that Sonya's primary psychiatric diagnosis was anxiety reaction due to family separation and that she also suffered from PTSD.  But she was improving due to a variety of factors, including her divorce, work, medication, and a new relationship.

Dr. Robert Simon, designated by the court as an expert in forensic psychology, testified as a rebuttal witness.  He expressed serious concern that Dr. Watkins was not a specialist in anxiety disorders.  Dr. Simon was also skeptical of Sonya's PTSD diagnosis as the screening device used by Dr. Watkins to diagnose her PTSD was not designed for that purpose.  He further noted that even if PTSD were properly diagnosed, Dr. Watkins could not know independently what caused it since he did not witness the events between Sonya and Robert and was unaware of other events in Sonya's life that could have triggered trauma.

## ***The Trial Court's Findings and Conclusions***

On November 18, 2021, the court issued its order granting renewal of the DVRO and explained its ruling.  After reviewing the applicable law, the court stated that it found S. and J. to be credible witnesses.  On the other hand, the court found Sonya evasive and not credible: "I believe that she lacks insight as to the impact that her behavior actually has upon her children.  I do believe . . . that people can change.  Perhaps there has been some change in [Sonya], but based upon her testimony, I do not believe that it is so significant that the emotional abuse that she inflicted has stopped or

17

would stop if this restraining order was not re-issued." The court further noted that no evidence was offered to the court that Sonya had been in therapy for years and on medication, or whether she had complied with the prior court's order for psychotherapy years ago. The court gave little weight to the testimony offered by Dr. Watkins.

The court further explained that the "repeated violations that amounted to multiple criminal cases being filed, some of which were dismissed as a part of plea negotiation, which is customary, but that also resulted in criminal protective orders being filed, shows this Court that the apprehension that the abuse . . . . [t]he emotional abuse" will continue "has been clearly established." The court further found that "based upon the testimony and the evidence that the reasonableness that it would continue if a restraining order was not issued has clearly been demonstrated."

The court elected to extend the DVRO for five years until November 17, 2026. In reaching this term, the court wondered if Sonya would ever be able to repair her relationship with her children and advised: "[U]ntil you get some insight into how even just posting pictures of them to garner sympathy for yourself which then result in mutual friends and family putting them in a position of having to defend why they don't want to have a relationship with you is emotional abuse. Until you start to understand that you need to be silent on social media when it comes to them, when it comes to their father, you will get nowhere. I guarantee it." The court added that when her children are independent, it will be up to them do decide whether they want to try to repair their relationship with their mother.

After noting that the reissued DVRO "will include all the provisions . . . that were granted in the last four-year, an extended order," the court addressed the portion of the DVRO requiring Sonya to take down her

18

Facebook page and narrowed the scope of the restriction. The court stated: "In regards to the argument about Facebook and the new case [*Molinaro v. Molinaro* (2019) 33 Cal.App.5th 824] that blanket order to take down Facebook is an unconstitutional prohibition on first amendment rights, I would concede . . . that I believe that that law is good law."[3] The court thus narrowed the social media restriction in its order as follows: "[Y]ou are to cease and desist from any posting of anything that either is remotely related to your children to refuse/resist childhood – or parental alienation – anything that demeans or belittles their father whether you are intending to refer to him or leaving it up to the readers' imagination if 'He is a mercy fuck.' None of that will be posted on your Facebook. If you violate that, the Court will, again, order you to take down your entire page." The court asked Robert's counsel to prepare the reissuance and informed the parties its oral ruling constituted its statement of decision.

A month later, in December 2021, the reissued form DV-130 Restraining Order After Hearing ("December 2021 DV-130 Order" or "DV-130 Order") was filed. In item 23 – "Other Orders" – the social media restriction appeared as follows: "[Sonya] shall immediately take down from the Internet and social media any and all photos of the protected parties; and cease and desist from posting any photos, descriptions, references, or allusions to any of them for the duration of the protective order. [Sonya] will also cease and desist from posting anything directly or indirectly mentioning child/parental

_____

3 In closing argument, Sonya's counsel argued that under *Molinaro v. Molinaro* (2019) 33 Cal.App.5th 824 – a case decided after she was ordered to take down her Facebook page – broad prohibitions on social media activity peripherally related to a divorce constituted an unconstitutional prior restraint on free speech. Under this recent case law, Sonya contended the social media restriction that had been imposed upon her in the amended DVRO was unconstitutional and specifically requested that it not be renewed.

19

alienation as well as anything about Robert, including but not limited to that which may be immediately or remotely interpreted as demeaning or belittling to him."

On May 11, 2022, the statement of decision was filed. Tracking the court's oral ruling with some modifications, the statement provided: "In regards to [Sonya's] counsel's argument and the recent holding of *Molinaro v. Molinaro (2019) 33 Cal.App.5th 824* that blanket orders to take down Facebook [are] an unconstitutional prohibition on First Amendment rights, the Court agrees with counsel that that law is good law. The Court, however, may narrowly tailor its order and does so as follows: [Sonya] is ordered to cease and desist from any posting of anything that either is remotely related to the children, to resist/refuse childhood, parental alienation or anything that demeans or belittles their father whether [Sonya] is intending to refer to him directly or leaving it up to the readers' imagination if he is the subject of her post – for example the "mercy f*ck" to which she is referring. [Sonya] shall not post any of these things. If [Sonya] violates that order, the Court will again order her to take down her entire page." Item 23 of the DV-130 Order was not modified following the statement of decision.

Sonya objected to the renewed DVRO and now appeals it.

## DISCUSSION

### I. Robert's Motion to Dismiss

We first address Robert's motion to dismiss Sonya's appeal. He argues the appeal must be dismissed because of Sonya's "failure to provide anything even resembling an adequate record and for her failure to properly summarize the evidence supporting the [DVRO]." He echoes these contentions in his Respondent's Brief, adding that if the appeal is not dismissed, we should conclude Sonya has waived any contention she makes

20

regarding the sufficiency of the evidence in support of the trial court's findings. We decline to dismiss the appeal.

Robert is correct that the burden is on the appellant to provide an adequate record on appeal to assess error. (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1140–1141.) " 'Failure to provide an adequate record on an issue requires that the issue be resolved against [appellant].' " (*Foust v. San Jose Construction Co., Inc.* (2011) 198 Cal.App.4th 181, 187 (*Foust*).)

Here, Sonya provided a 228-page appendix, which includes the original DVRO (2015), the modified DVRO (2017), Robert's petition to renew the DVRO (2019), the parties' trial briefs, and the court's statement of decision. Sonya also provided an approximately 400-page reporter's transcript consisting of all four days of trial testimony during the renewal hearing. Robert augmented it with his own 3,887-page appendix. Because we have a complete record that enables us to address the issues Sonya raises on appeal, we are disinclined to dismiss the appeal.

We note that even without Robert's augmented record, we would not dismiss the appeal. Robert has cited no authority indicating that dismissing an appeal is the proper remedy for an inadequate record. For instance, in *Foust*, *supra*, 198 Cal.App.4th 181, the appellant's failure to provide a reporter's transcript or other statement of the evidence resulted in the issue being decided against the appellant and affirmance of the trial court decision. (*Id.* at p. 187.) In *Bel Air Internet, LLC v. Morales* (2018) 20 Cal.App.5th 924, the court expressly concluded the appellants did not forfeit their appeal by failing to provide the reporter's transcript because the issue on appeal was reviewed de novo and the available record included all the materials germane to the ruling under review. (*Id.* at p. 933.) None of the other cases cited by Robert involved the *dismissal of an appeal* due to an inadequate record.

21

In addition, one of Sonya's primary contentions is whether the renewed DVRO constitutes an unconstitutional prior restraint on speech, for which our review is de novo. (*Berry v. City of Santa Barbara* (1995) 40 Cal.App.4th 1075, 1082.) Robert makes no showing as to how any of the purportedly dozens of "pertinent records that [Sonya] failed to include" bears on our review of this issue. For these reasons, we decline to dismiss Sonya's appeal due to an inadequate record.

Robert is also correct that it is an appellant's duty to set forth all the evidence on which the trial court relied in granting the DVRO. California Rules of Court, rule 8.204(a)(2)(C), states that an appellant's opening brief must "[p]rovide a summary of the significant facts limited to matters in the record." (Cal. Rule Court, rule 8.204(a)(2)(C).) "[A]n appellant has a duty to summarize the facts fairly in light of the judgment." (*Ajaxo Inc. v. E\*Trade Group Inc.* (2005) 135 Cal.App.4th 21, 50.) An appellant's one-sided recitation of the facts risks forfeiture of her claims. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 (*Foreman & Clark*).)

Here, we agree that Sonya's summary of significant facts in her appellate briefs is incomplete and unrepresentative. For instance, the statement of facts in her opening brief makes no reference to the substance of the children's testimony, nor does it reference any of the criminal complaints filed against her, the criminal protective orders issued against her, or the negotiated dispositions she entered, and which were pivotal to court's renewal order. Most of the evidence she cites to in her statement of facts is her own testimony.

Even if we again assume such a skewed summary of significant facts constitutes a violation of rule 8.204(a)(2)(C), Robert has not provided any authority supporting his view that the penalty for such a violation is

22

dismissal of the appeal.  Rule 8.204 does not authorize us to dismiss an appeal for violating its terms.  (See generally Cal. Rules of Court, rule 8.204(e).)  For a filed brief, noncompliance with the rule to provide a fair summary of the facts authorizes us to order the brief returned for corrections and refiling within a specified time, or to strike the brief with leave to file a new brief within a specified time.  (Cal. Rules of Court, rule 8.204(e).)  We did neither.  Such orders would have been unnecessary since we can deem any contentions not supported as waived.  (See *Toigo v. Town of Ross* (1998) 70 Cal.App.4th 309, 317 (*Toigo*) [" 'When appellants challenge the sufficiency of the evidence, all material evidence on the point must be set forth and not merely their own evidence.  [Citation.]  Failure to do so amounts to waiver of the alleged error and we may presume that the record contains evidence to sustain every finding of fact.' "]; *Foreman & Clark*, *supra*, 3 Cal.3d at p. 881.)

For these reasons, Sonya's presentation of the facts of the case, albeit one-sided and incomplete, does not provide grounds for dismissal of her appeal, and we proceed to the merits of her claims.

## II. Sonya's Contentions on Appeal

### A. Reasonable Apprehension of Future Abuse for DVRO Renewal

Sonya argues the trial court abused its discretion in renewing the DVRO for another five years because the order was not supported by substantial evidence.  We disagree.

#### 1. *Applicable Law*

The purposes of the Domestic Violence Prevention Act "are to prevent acts of domestic violence, abuse and sexual abuse and to provide for a separation of the persons involved in the domestic violence for a period sufficient to enable these persons to seek a resolution of the causes of the

23

violence." (Fam. Code, § 6220.) Family Code section 6345, which governs renewal of a DVRO, provides that such an order "may be renewed, upon the request of a party, either for five or more years, or permanently, at the discretion of the court, without a showing of further abuse since the issuance of the original order . . . subject to termination [or] modification . . . by further order of the court either on written stipulation filed with the court or on the motion of a party." (*Id.*, § 6345, subd. (a).)

The legal standard for renewal of a DVRO is whether the protected party entertains a reasonable apprehension of future abuse. (*Ritchie v. Konrad* (2004) 115 Cal.App.4th 1275, 1290 (*Ritchie*).) "[T]his does not mean the court must find it is more likely than not future abuse will occur if the protective order is not renewed. It only means the evidence demonstrates it is more probable than not there is a sufficient risk of future abuse to find the protected party's apprehension is genuine and reasonable." (*Ibid.*) An imminent and present danger of abuse is not required; there must only be a reasonable apprehension that "abuse will occur at some time in the future if the protective order is allowed to expire." (*Id.* at p. 1288.)

*Ritchie* explained this standard sets an objective test for renewal of a DVRO: "It is not enough [the requesting] party entertain[s] a subjective fear the party to be restrained will commit abusive acts in the future. The 'apprehension' those acts will occur must be 'reasonable.' That is, the court must find the probability of future abuse is sufficient that a reasonable woman (or man, if the protected party is a male) in the same circumstances would have a 'reasonable apprehension' such abuse will occur unless the court issues a protective order." (*Ritchie*, *supra*, 115 Cal.App.4th at p. 1288.)

*Ritchie* further noted it is "unnecessary for the protected party to introduce or the court to consider actual acts of abuse the restrained party

24

committed after the original order went into effect.  It would be anomalous to require the protected party to prove further abuse occurred in order to justify renewal of that original order.  If this were the standard, the protected party would have to demonstrate the initial order had proved ineffectual in halting the restrained party's abusive conduct just to obtain an extension of that ineffectual order.  Indeed the fact a protective order has proved effective is a good reason for seeking its renewal." (*Ritchie, supra*, 115 Cal.App.4th at p. 1284.)

Nor is it necessary for the protected party to show reasonable apprehension of future *physical* abuse.  (*Eneaji v. Ubboe* (2014) 229 Cal.App.4th 1457, 1463 (*Eneaji*).)  The Domestic Violence Protection Act defines "abuse" broadly to include any behavior that could be enjoined under section 6320, such as harassing or disturbing the peace of the other party. (Fam. Code, § 6203, subd. (a); *In re Marriage of Brubaker & Strum* (2021) 73 Cal.App.5th 525, 536.)  This definition encompasses "a multitude of behaviors" that "[do] not involve any physical injury or assaultive acts." (*Eneaji*, at p. 1464.)

In evaluating whether the requesting party has a reasonable apprehension of future abuse, the trial court ordinarily considers the evidence and findings on which the initial DVRO was based.  (*Ritchie, supra*, 115 Cal.App.4th at p. 1291 ["[T]he underlying findings and facts supporting that order often will be enough in themselves to provide the necessary proof to satisfy that test."].)  "Also potentially relevant are any significant changes in the circumstances surrounding the events justifying the initial protective order.  For instance, have the restrained and protected parties moved on with their lives so far that the opportunity and likelihood of future abuse has diminished to the degree they no longer support a renewal of the order?"

(*Ibid*.) "Also relevant are the seriousness and degree of risk, such as whether it involves potential physical abuse, and the burdens the protective order imposes on the restrained person, such as interference with job opportunities." (*Lister v. Bowen* (2013) 215 Cal.App.4th 319, 333 (*Lister*).)

The trial court's ruling on a request to renew a domestic violence prevention restraining order is reviewed for an abuse of discretion. (*Lister*, *supra*, 215 Cal.App.4th at p. 333; *Rybolt v. Riley* (2018) 20 Cal.App.5th 864, 874–875 (*Rybolt*).) In considering the evidence supporting a DVRO, " 'the reviewing court must apply the "substantial evidence standard of review," meaning " 'whether, on the entire record, there is any substantial evidence, contradicted or uncontradicted,' supporting the trial court's finding. [Citation.] 'We must accept as true all evidence . . . tending to establish the correctness of the trial court's findings . . . , resolving every conflict in favor of the judgment.' " ' " (*In re Marriage of Evilsizor & Sweeney* (2015) 237 Cal.App.4th 1416, 1424.)

### 2. Analysis

As an initial matter, for her unrepresentative presentation of the trial court record as described above, we conclude Sonya has waived her contentions challenging the sufficiency of the evidence on appeal. (See *Toigo*, *supra*, 70 Cal.App.4th at p. 317.) We nevertheless discuss the evidence supporting the trial court's decision to renew the DVRO to demonstrate the court's decision was amply supported and it did not abuse its discretion in renewing.

Based on the standard elaborated in *Ritchie* and its progeny, there was substantial evidence that Robert, S., and J. maintained a reasonable apprehension of future abuse by Sonya. Collectively, they presented Sonya's history of verbal, emotional, and physical abuse towards them before the

26

initial DVRO was issued. The extensive record is replete with evidence of such abuse, and we just cite a few examples. In addition to submitting the original DVRO as evidence, Robert described one incident in which Sonya "grabbed [him] by the testicles" and "yank[ed] him around" and another incident in which Sonya slapped him and kicked him in the groin prior. S. recounted the incident which resulted in the initial DVRO in which her mother elbowed her in the face during an argument, and deliberately excluded the incident from the video she was recording of their dispute. J. stated generally that his mother lashed out against others in a destructive matter and made their family home a hostile environment. The initial DVRO and the reasons for it supported renewal. (See *Lister*, *supra*, 215 Cal.App.4th at p. 333 ["In evaluating whether the requesting party has a reasonable apprehension of future abuse, 'the existence of the initial order certainly is relevant and the underlying findings and facts supporting that order often will be enough in themselves to provide the necessary to satisfy that test.' "].)

There was also ample evidence that Sonya routinely violated the DVRO, as the trial court found. There were multiple criminal complaints charging Sonya with contempt for violating the DVRO or other criminal protective orders that had been issued against her. Sonya pled no contest to at least three of these contempt charges as part of negotiated dispositions to resolve other, more serious criminal charges pending against her for her behavior towards Robert. Beyond these violations which resulted in criminal charges, each family member testified to additional violations of the DVRO on multiple occasions. These violations of the existing DVRO and protective orders further supported the court's renewal order. (See *Lister*, *supra*, 215 Cal.App.4th at p. 335 ["It almost goes without saying that any violation of a restraining order is very serious, and gives very significant support for

27

renewal of a restraining order."]; see also *Rybolt, supra,* 20 Cal.App.5th at p. 876.) This evidence was adequate to establish a reasonable apprehension of future abuse in support of the DVRO's renewal.

Sonya argues that her behavior since 2017 has not been abusive, threatening or harassing. She claims the "evidence presented at trial . . . does not come close to meeting the objective test that [she] did anything to cause a reasonable person to have 'reasonable apprehension of future abuse.' " While acknowledging her violations of the DVRO or other protective orders, she contends such violations were based on "minimal and non-threatening conduct." In her view, Robert presented no evidence showing her conduct since 2017 would cause anyone to be fearful of abuse.

These arguments do not undermine the renewal order. Sonya offers no explanation as to why only her behavior post-2017 matters. As noted, a trial court ruling on a renewal request should consider evidence and findings on which the original DVRO was based, which is often sufficient to support a renewal. (*Ritchie, supra*, 115 Cal.App.4th at pp. 1290–1291.) Moreover, a showing of recent abuse is not required to demonstrate a reasonable apprehension of future abuse. (*Eneaji, supra*, 229 Cal.App.4th at p. 1464.) In addition, Sonya's efforts to minimize her violations of the DVRO or CPOs or to characterize her actions underlying those violations as non-abusive and non-threatening are unavailing. These arguments appear to seek to relitigate the evidence, but we are required to defer to the court's credibility determinations and make all reasonable inferences in support of the court's findings. (*In re Marriage of Martindale & Ochoa* (2018) 30 Cal.App.5th 54, 61.) The court found Sonya was not credible, and we defer to that determination. (*Ibid.*) These arguments in any event simply disregard the fact that the violations alone – many which resulted in criminal contempt

charges to which she pled no contest – are sufficient to support the renewal order. (*Lister*, *supra*, 215 Cal.App.4th at p. 335.)

Sonya also contends that the court erred because it did not consider the impact the restraining order would have on her. She cites her participation in book club and attendance at the Mormon church as activities impacted by the restraining order. More importantly, she explains that her relationship with S. and J. has suffered and posits that cutting off all of her communications with them could harm them. She further laments that unless reversed, the reissued order will prevent any possibility of reconciling with her children through November 17, 2026.[4]

We are not persuaded by these arguments either. There was no evidence that Robert or the children were book club participants or regular churchgoers, such that Sonya's participation in these activities were impacted by the renewed DVRO. While Sonya's concerns about the burden the renewed DVRO places on her ability to try to reconcile with her children appear to be more genuine, we have no basis to conclude the court did not consider this in making its ruling. In conveying its ruling, the trial court cited to *Ritchie* as the proper legal standard, so "[w]e presume the trial court knew and properly applied the law absent evidence to the contrary." (*McDermott Will & Emery LLP v. Superior Court* (2017) 10 Cal.App.5th 1083,

---

[4] In asserting these arguments, Sonya suggests certain testimony she sought to introduce from a Dr. Robert Kaufman should have been considered by the court. She asserts that "the court's decision not to allow Dr. Kaufman to testify about considering alternatives to a restraining order" was "improper." To the extent these statements seek to challenge the court's evidentiary ruling, such arguments have been waived. (*Brown v. El Dorado Union High School Dist.* (2022) 76 Cal.App.5th 1003, 1022 [" ' "[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration." ' "].)

1103). This includes consideration of the burdens on the restrained party if subjected to a continuing protective order. (*Ritchie*, *supra*, 115 Cal.App.4th at pp. 1283, 1292.) We also presume the trial court considered these burdens on Sonya because when issuing its ruling, her admonishment to Sonya specifically invoked the court's uncertainty as to Sonya's ability to repair her relationship with her children, noting it would be up to them when they were truly independent adults. Finally, the court did not grant the permanent DVRO Robert requested and limited the duration of the renewed order to five years. Under these circumstances, we cannot conclude the court failed to consider the burden of the renewed DVRO on Sonya.

In sum, the trial court was within its discretion to conclude that the totality of the evidence indicated it was more probable than not there was a sufficient risk of future abuse to find that Robert's and the children's apprehension was genuine and reasonable. The court did not err in renewing the restraining order.

## B. Constitutionality of Restrictions in Item 23 of DV-130 Order

Sonya also contends the DVRO violated her constitutional rights because it is a prior restraint that prevents her from exercising her free speech rights. Specifically, she targets as unconstitutional the social media restrictions set forth in item 23 in the December 2021 DV-130 Order and requests they be stricken.[5]

---

[5] We issued pre-oral argument focus questions asking the parties to address the differences between the social media and internet restrictions set forth in item 23 of the DV-130 Order and the court's statements regarding those restrictions delivered orally at the November 18, 2021, hearing and in the May 11, 2022, written statement of decision. (See *ante*.) We asked whether the language in item 23 in the DV-130 Order should be modified based on these other statements and whether such a modification would be

30

Sonya's constitutional arguments attack item 23 primarily as an overbroad prior restraint on speech. We do not address these contentions since we conclude item 23 is unreasonably vague and shall remand to the trial court to modify on this basis.

A restraining order is unconstitutionally vague when the order does not clearly define the conduct prohibited. (*Evans v. Evans* (2008) 162 Cal.App.4th 1157, 1167.) " 'An injunction must be narrowly drawn to give the party enjoined reasonable notice of what conduct is prohibited.' [Citation.] It 'must be sufficiently precise to provide a person of ordinary intelligence fair notice that her contemplated conduct is forbidden.' " (*Midway Venture LLC v. County of San Diego* (2021) 60 Cal.App.5th 58, 92.) " 'An injunction which forbids an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application exceeds the power of the court.' " (*People ex rel. Gascon v. HomeAdvisor, Inc.* (2020) 49 Cal.App.5th 1073, 1082.) Whether a restraining order infringes upon the constitutional rights of the restrained party because it is vague presents a question of law subject to de novo review. (*Harris v. Stampolis* (2016) 248 Cal.App.4th 484, 497.)

While it is abundantly clear and there is no dispute that the court did not intend to impose a blanket prohibition of Sonya's use of Facebook or other social media with the item 23 restrictions, the specific scope of those restrictions is unreasonably vague. As noted, item 23 states: "[Sonya] shall immediately take down from the Internet and social media any and all photos

---

unconstitutionally vague or overbroad or a prior restraint. No party provided any authority for modifying item 23 of the DV-130 Order to reflect the versions of the restriction as stated orally or in the statement of decision. Therefore, we address Sonya's constitutional arguments against the existing language in item 23 of the DV-130 Order.

of the protected parties; and cease and desist from posting any photos, descriptions, references, or allusions to any of them for the duration of the protective order. [Sonya] will also cease and desist from posting anything directly or indirectly mentioning child/parental alienation as well as anything about Robert, including but not limited to that which may be immediately or remotely interpreted as demeaning or belittling to him."

Under this language, Sonya risks violating the DVRO by posting anything "directly or indirectly mentioning child/parental alienation," but what is meant by "child/parental alienation" is not explained, and not reasonably understood. Nor is it clear whether the restriction enjoins Sonya from writing about this topic as a general matter (which may raise overbreadth concerns) or specifically with respect to her children. The scope of the restrictions with respect to social media posts involving Robert and the children is also unclear. Specifically, it is not clear whether Sonya is enjoined from posting about them generally (which again may raise overbreadth concerns) or whether her posts about them are limited to those that would be demeaning, belittling, or otherwise abusive under the Domestic Violence Prevention Act (see Fam. Code, §§ 6203, 6320.) Because a reasonable person must necessarily guess at the meaning of item 23, it cannot stand as written.[6]

Having concluded that item 23 is unreasonably vague, we do not reach Sonya's other arguments, including whether the restriction is an

---

[6]     The clarity of item 23 is further undermined by the two other variations of the social media restrictions which were stated orally and memorialized in the statement of decision. For example, in those rulings, prohibited posts about the children appear to be limited to anything related to the children "to refuse/resist childhood." Likewise, in those rulings, restricted posts about Robert appear to be limited to those that belittle or demean him, which appears appropriately narrower than the broad formulation in item 23.

unconstitutional prior restraint, because the trial court will presumably revisit the scope of the restriction on remand.

## DISPOSITION

The matter is remanded to the trial court for the limited purpose of modifying item 23 in the DV-130 order consistent with views expressed in this opinion.  In all other respects, the renewed DVRO is affirmed.  The parties are to bear their own costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(5).)

 

_____
Petrou, J.

WE CONCUR:


_____
Tucher, P.J.


_____
Rodríguez, J.